UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 12-4563**

———————

UNITED STATES OF AMERICA,

                Plaintiff - Appellee,

      v.

COREY THOMAS JONES,

                Defendant - Appellant.

———————

**No. 12-4565**

———————

UNITED STATES OF AMERICA,

                Plaintiff - Appellee,

      v.

WILLIAM LOUIS COLE, JR.,

                Defendant - Appellant.

———————

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, Senior District Judge. (1:11-cr-00530-CMH-2; 1:11-cr-00530-CMH-1)

———————

Argued: May 17, 2013           Decided: July 18, 2013

———————

Before TRAXLER, Chief Judge, KING, Circuit Judge, and HAMILTON, Senior Circuit Judge.

———————

Affirmed by unpublished per curiam opinion.

---

**ARGUED:** Jerome Patrick Aquino, Springfield, Virginia; Maureen Leigh White, Richmond, Virginia, for Appellants. Patricia Tolliver Giles, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Neil H. MacBride, United States Attorney, Rebeca H. Bellows, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Appellants Corey Thomas Jones and William Louis Cole, Jr., were convicted by a jury of conspiracy to commit bank robbery, see 18 U.S.C. § 371, and armed bank robbery, see 18 U.S.C. § 2113(a) and (d). Additionally, Cole was convicted of using and carrying a firearm during and in relation to a crime of violence, see 18 U.S.C. § 924(c)(1)(A), and unlawfully possessing a firearm, see 18 U.S.C. § 922(g)(1). Appellants raise numerous challenges to their convictions, and Cole challenges his sentence. For the reasons that follow, we reject their arguments and affirm their convictions and sentences.

I.

On June 27, 2011, two masked men robbed at gunpoint the Arlington Boulevard branch of the BB&T bank in Fairfax, Virginia. BB&T's video surveillance system recorded the robbery. Based on surveillance photos and the testimony of BB&T employees present during the robbery, the facts of the robbery itself are not a matter of dispute. At approximately 2:00 p.m., an African-American male with long dreadlocks entered the bank, approached the teller line, and "stated that he wanted to make a withdrawal." J.A. 205. He was wearing sunglasses, a white painter's mask, and white gloves. A second suspect, also African American, entered the bank immediately after the first, wearing a similar mask and sunglasses and carrying a black gun.

He was stocky, wore light jeans, light gray tennis shoes and black gloves. While the second suspect pointed the gun at BB&T employees, the first suspect jumped over the tellers' counter and took cash from the drawers.

The bank robbers fled the building with approximately $9,860, but BB&T employees managed to obtain the District of Columbia license plate number of a Plymouth Voyager leaving the scene. The police located the Voyager within 10 minutes of the robbery, abandoned in a nearby neighborhood. The vehicle was running without keys and the ignition column had been punched out. Police later discovered that the Voyager had been stolen earlier that day from the intersection of First Street, NW, and North Streets in Washington, D.C.

Approximately one hour before the bank robbery occurred, Allan Luai, who worked in an office across the street from the BB&T, noticed two African-American males sitting in a BMW that was parked in Luai's lot. The BMW displayed Maryland plates and the occupants were watching the BB&T. Noticing that the BMW remained situated like this for 15-20 minutes, Luai became suspicious and wrote down the license plate number which he gave to police shortly after the robbery. The BMW's license plates, in turn, led the police to Cole. Although the car was registered to Cole's sister, Cole owned and operated the vehicle.

After the responding law enforcement officers connected the BMW tag number to Cole, they notified Sergeant David Blazer that Cole's car had been spotted by a witness near the scene of an armed bank robbery and asked him to conduct surveillance of Cole. Sergeant Blazer was familiar with Cole because he had previously investigated Cole's involvement in unrelated criminal activities, including a 2010 armed robbery of a check cashing establishment for which Cole had been charged. The surveillance photos from BB&T's security system were forwarded to Sergeant Blazer, who observed that the second bank robber entering the bank matched Cole's stocky build. He also observed that the stockier suspect was wearing light-colored jeans and light-colored, gray tennis shoes. Sergeant Blazer noted that the first suspect was wearing white gloves.

Sergeant Blazer observed Cole arriving at the residence of his mother not long after the robbery, driving the same BMW that Luai saw near the bank shortly before the robbery. He further observed that Cole was wearing light-colored jeans like those worn by the gunman in the surveillance photographs.

About 6:30 p.m. that evening, Cole departed from his mother's home in the same BMW. At Sergeant Blazer's direction, Officer Lawrence conducted a traffic stop of Cole's BMW. Officer Lawrence told Cole that he had been stopped for failure to wear a seatbelt. While officers performed the traffic stop,

Sergeant Blazer noticed that although Cole had changed his pants, he was wearing gray tennis shoes similar to those worn by one of the bank robbers in the surveillance photos sent to him. Sergeant Blazer also noticed white latex gloves in the open center console of Cole's car, a detail he found significant because in the surveillance photos "one of the individuals appeared to be wearing white latex gloves in the bank robbery." J.A. 271. Sergeant Blazer then arrested Cole for the BB&T robbery. Cole had $802 in his pocket.

A subsequent search of the BMW yielded the white latex gloves, a pair of black gloves from the trunk, and two cell phones from the front seat. One of the cell phones was a Sprint HTC phone belonging to Cole. Law enforcement agents conducted a forensic examination of Cole's phone and were able to recover numerous text messages between Cole's phone and the cell phone used by Jones. The forensic examination included historical cellsite analysis to determine the physical location of Cole's and Jones's cell phones at the time calls were made by them.

This analysis showed that four days before the robbery, Cole texted Jones that "I got a lil situation for about 5 stacks in about an [hour] if [you] want in on it. [It's] real light work with no uniforms involved." J.A. 585. The BB&T branch on Arlington Boulevard had no uniformed security guards. In response, Jones texted "Sweet." J.A. 585. FBI investigators

were able to pinpoint the location of Cole's cell phone that same day on Arlington Boulevard in Fairfax, near the BB&T. On the day before the robbery, Jones texted Cole to ask "[what's] that robbery site?" J.A. 549. Cole responded "[You] have to go under commercial armed robberies in whatever county [you] looking for." Id.

Early on the morning of the robbery, Jones sent Cole a text inquiring whether Cole was coming to get Jones or if Cole wanted Jones to get a ride from his girlfriend. The evidence showed that at 10:30 a.m., the phones for both Cole and Jones were located in northwest Washington, D.C., near the spot where the Plymouth Voyager used as the getaway vehicle was stolen. Around 11:00 a.m., Jones's cell phone was used to call Cole's number from near the BB&T back in Fairfax.

Cole and Jones were both indicted for armed bank robbery, conspiracy to commit armed bank robbery, and using and carrying a firearm during and in relation to a crime of violence. Cole alone was indicted for unlawfully possessing a firearm as a felon.

Prior to trial, Cole moved to suppress the evidence recovered from his BMW on the basis that law enforcement had no justification for performing the initial traffic stop or probable cause for arresting him during the stop. Jones filed a pretrial motion to strike the jury panel because it did not

include any African-Americans.  The district court denied both motions, and the case went to trial.  The jury found Cole guilty on all four counts.  The jury found Jones guilty of armed bank robbery and conspiracy to commit armed bank robbery, but acquitted him of using and carrying a firearm during a crime of violence.

Approximately two weeks after trial, Jones moved for discovery regarding the Eastern District of Virginia's method of selecting jury panels to determine if the lack of African Americans on the jury panel was an anomaly or the result of systematic discrimination.  The court denied the motion, finding nothing to show any systematic discrimination.

Cole was sentenced to 60 months each for the armed robbery, conspiracy, and felon-in-possession counts, to run concurrently, and a consecutive term of 84 months for using and carrying a firearm during and in relation to a crime of violence.  Cole challenges the district court's imposition of an obstruction enhancement in determining Cole's advisory guideline range. Jones does not challenge his sentence.

## II.

Cole challenges the district court's denial of his pretrial motion to suppress evidence recovered from a search of his BMW following his traffic stop and arrest.  When considering the denial of a motion to suppress, our review of the district

8

court's factual findings is for clear error and our review of its legal conclusions is de novo. See United States v. Lewis, 606 F.3d 193, 197 (4th Cir. 2010). "Since the district court denied the defendant's motion below, we construe the evidence in the light most favorable to the government." United States v. Branch, 537 F.3d 328, 337 (4th Cir. 2008).

Cole first contends that the police had no justifiable basis for making the initial traffic stop. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." Whren v. United States, 517 U.S. 806, 809-10 (1996). A traffic stop, generally speaking, is permissible if the officer has "probable cause to believe that a traffic violation has occurred." Id. at 810.

At the suppression hearing, Officer Lawrence testified that he followed Cole in his BMW at a distance of about 10-15 feet. Because it was still daylight and the weather was clear, Officer Lawrence could see that Cole was not wearing his shoulder restraint and that the belt buckle was near the door jamb and therefore could not have been fastened. After Officer Lawrence noticed the infraction, he activated his lights and stopped Cole.

Cole testified at the suppression hearing, claiming that he was wearing his seatbelt. Cole also presented testimony from a former police officer that, based on the former officer's training, he believed that it is difficult to observe whether a driver is wearing a seatbelt from a rear vantage point.

The district court credited the testimony of Officer Lawrence and concluded that he was justified in making to initial traffic stop. We give particular deference "to a district court's credibility determinations, for it is the role of the district court to observe witnesses and weigh their credibility during a pre-trial motion to suppress." United States v. Abu Ali, 528 F.3d 210, 232 (4th Cir. 2008) (internal quotation marks omitted). Construing the record in the light most favorable to the government, we perceive no error of law or fact in the district court's determination that there was probable cause to make the initial traffic stop.

Cole further argues that even if there was sufficient justification for the initial stop, the police lacked probable cause to support Cole's arrest for the BB&T robbery. We cannot agree. "Probable cause to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."

United States v. Williams, 10 F.3d 1070, 1073-74 (4th Cir. 1993) (internal quotation marks omitted).

Viewing the evidence in the light most favorable to the government, Sergeant Blazer knew at least the following facts: 1) a witness had seen Cole's BMW near the scene of the robbery; 2) Cole's stocky build matched that of the bank robber holding the gun in the BB&T surveillance photos; 3) Cole was wearing light-colored jeans like the bank robber in the surveillance photos when he arrived at his mother's house within hours of the robbery; 4) Cole was wearing light-colored tennis shoes like the robber who was holding the gun in the surveillance photos; and 5) the other bank robber wore white gloves in the surveillance images and there were white gloves in the console of Cole's car at the time of the traffic stop.

Although the subsequently-developed cell phone evidence significantly strengthened the government's case, "evidence sufficient to convict is not required" for probable cause to exist. Brown v. Gilmore, 278 F.3d 362, 367 (4th Cir. 2002). We are satisfied that Officer Blazer had probable cause to arrest Cole for the bank robbery when he took him into custody.

                                III.

Appellants assert that there was insufficient evidence to support their convictions. On a challenge to the sufficiency of the evidence, we view the evidence "in the light most favorable

                                11

to the prosecution" and ask whether "<u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>United States v. Collins</u>, 412 F.3d 515, 519 (4th Cir. 2005) (internal quotation marks omitted). We review both direct and circumstantial evidence, according the government all reasonable inferences from the facts shown to those sought to be established. <u>See</u> <u>United States v. Harvey</u>, 532 F.3d 326, 333 (4th Cir. 2008). We assume that the jury resolved all contradictions in the testimony in favor of the government. <u>See</u> <u>United States v. Kelly</u>, 510 F.3d 433, 440 (4th Cir. 2007).

To prove armed bank robbery, the government must prove that "(1) the defendant took . . . money belonging to a bank . . .; (2) by using force and violence, or intimidation; (3) the [bank's] deposits . . . were federally insured; and (4) in committing . . . the offense, the defendant assaulted any person, or put in jeopardy the life of any person by the use of a dangerous weapon or device." <u>United States v. Davis</u>, 437 F.3d 989, 993 (10th Cir. 2006).

As for conspiracy, the essence of the crime "is an <u>agreement</u> to effectuate a criminal act." <u>United States v. Laughman</u>, 618 F.2d 1067, 1074 (4th Cir. 1980). "Sustaining a conspiracy conviction under 18 U.S.C. § 371 requires that the government prove: (1) an agreement between two or more people to

commit a crime, and (2) an overt act in furtherance of the conspiracy." United States v. Ellis, 121 F.3d 908, 922 (4th Cir. 1997).

The evidence previously summarized shows there was clearly sufficient evidence to convict both defendants for armed bank robbery and conspiracy to commit armed bank robbery. The jury could conclude, based on this evidence, that the defendants acted together, planned the robbery, scouted out the location in advance, stole the getaway car, and committed the robbery. The cell phone evidence placed them at the scene of the robbery and reflected text messages explicitly mentioning robbery and that the target bank did not use uniformed security personnel.

To secure a conviction under 18 U.S.C. § 922(g)(1), the government must establish that (1) the defendant was a convicted felon; (2) he knowingly possessed the firearm; and (3) the firearm traveled in interstate commerce. See United States v. Gallimore, 247 F.3d 134, 136 (4th Cir. 2001). The bank surveillance photos showed the gun being wielded by the stockier of the two robbers. Since the evidence was sufficient to allow a conviction of the defendants on the robbery and conspiracy counts, the jury reasonably could have determined that, as between Cole and Jones, Cole had to be the gunman as he was stockier and generally fit the description of the bank robber who was using the gun. And like the man with the gun, Cole wore

light-colored jeans not long after the robbery and was wearing gray tennis shoes when arrested. Thus, we reject the sufficiency challenges and affirm the convictions.[1]

                              IV.

Defendants argue that in its closing argument, the government referred to facts not in evidence when it suggested that Jones, who did not have dreadlocks at the time of the robbery, wore a dreadlock wig as a disguise. Because the defendants did not object to the government's closing argument, we review for plain error. Under the plain error standard, a defendant must show "(1) that an error occurred, (2) that the error was plain, and (3) that it affected his substantial rights." United States v. Penniegraft, 641 F.3d 566, 575 (4th Cir. 2011). Even if the defendant meets these requirements, we will exercise our discretion to correct the error "only when failure to do so would result in a miscarriage of justice, such as when the defendant is actually innocent or the error

_____

[1] Cole also argues that the government failed to offer evidence that the firearm traveled in interstate commerce. Because this claim is raised for the first time in his reply brief, Cole has waived consideration of it. See Yousefi v. INS, 260 F.3d 318, 326 (4th Cir. 2001) (per curiam). Although § 922(g)(1)'s interstate commerce element is often described as jurisdictional, "it is 'jurisdictional' only in the shorthand sense that without that nexus, there can be no federal crime"; it does not affect a court's "power to adjudicate a case." United States v. Martin, 526 F.3d 926, 933 (6th Cir. 2008). Cole's argument presents nothing more than an untimely challenge to the sufficiency of the evidence that is subject to waiver.

                              14

seriously affects the fairness, integrity or public reputation of judicial proceedings." Id. (internal quotation marks and alteration omitted).

Defendants raise their claim pursuant to United States v. Wilson, 135 F.3d 291, 299 (4th Cir. 1998), which asks whether a prosecutor's improper remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." United States v. Caro, 597 F.3d 608, 624 (4th Cir. 2010) (internal quotation marks omitted). To prevail, "the defendant must show that the prosecutor's remarks or conduct were improper and . . . that such remarks or conduct prejudicially affected his substantial rights so as to deprive him of a fair trial." United States v. Scheetz, 293 F.3d 175, 185 (4th Cir. 2002).

During closing argument, the government is permitted to draw reasonable inferences from the evidence adduced during the trial. See United States v. Francisco, 35 F.3d 116, 120 (4th Cir. 1994) (per curiam). However, the prosecutor must adhere to the "fundamental rule, known to every lawyer, that argument is limited to the facts in evidence." United States v. Lighty, 616 F.3d 321, 361 (4th Cir. 2010) (internal quotation marks omitted). In this case, the prosecution was suggesting that the jury make a reasonable inference. The evidence connected Cole and Jones with the incriminating text messages and put them near

the BB&T close to the time of the robbery and in Washington, D.C., near the location where the getaway vehicle was stolen. The surveillance shots showed two bank robbers that matched the general physical build of Cole and Jones. Thus, the government was asking the jury to make a reasonable inference that Jones was wearing a wig, like his mask, to disguise himself.

This is not the type of misstatement that "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Caro, 597 F.3d at 624. Moreover, defense counsel actually addressed the government's theory about the wig during summation for the defense, challenging its validity and pointing out for the jury that the government failed to produce any evidence that Jones wore a wig. Thus, applying a plain error standard of review, we conclude that defendants' challenge to the government's closing argument does not avail them. The district court committed no error, plain or otherwise.

V.

Jones and Cole also challenge the district court's denial of their post-trial motion for discovery regarding the jury selection procedure used by the United States Courts in the Southern District of Virginia. For the reasons that follow, this challenge is unavailing as well.

African-Americans make up 11.6% of the population in the Northern Virginia community; however, the 45-person pool from which defendants' jury was drawn did not include any African-Americans. Jones moved before trial to strike the jury panel, arguing that his Sixth Amendment right to a jury drawn from a panel reflecting a fair cross-section of the community was violated. See Taylor v. Louisiana, 419 U.S. 522, 537 (1975) ("[T]he Sixth Amendment affords the defendant in a criminal trial the opportunity to have the jury drawn from venires representative of the community . . . ."). To prevail on a Sixth Amendment fair cross-section claim, a defendant must show that a "'distinctive'" group is underrepresented, generally and on his particular venire, "in relation to the number of such persons in the community," and that such underrepresentation "is due to systematic exclusion of the group in the jury-selection process." Duren v. Missouri, 439 U.S. 357, 364 (1979). That is, defendant must demonstrate that the underrepresentation was "inherent in the particular jury-selection process utilized." Id. at 366. Noting that the jury pool was drawn through the use of voter registration lists, the district court denied the motion to strike the panel. See United States v. Cecil, 836 F.2d 1431, 1454 (4th Cir. 1988) (en banc) ("We are reasonably confident that every jury plan in this Circuit, as well as those in most of the other Circuits, provides for the use of voter

registration lists in the jury selection process . . . [which] have been approved, as satisfying the fair cross-section requirement of the statute and the Constitution.").

Two weeks after trial, defendants filed a post-trial motion seeking discovery into the jury selection process for the Eastern District of Virginia. The district court held a hearing and denied the motion for discovery, noting that "[w]e have a random system of selecting juries"—voter registration lists—and that defendants were on a "fishing expedition" in hopes of finding evidence to show that the absence of African Americans on their jury panel was due to systematic, inherent discrimination. J.A. 698.

On appeal, defendants challenge the denial of the motion for discovery, but <u>not</u> the denial of the motion to strike the jury panel. It is not completely clear whether defendants moved below for discovery under the Jury Selection and Service Act ("JSSA") or the Sixth Amendment. Either way, the motion was untimely and we affirm its denial.

The JSSA codifies the Sixth Amendment right to have a jury selected from a fair cross section of the community, stating that federal litigants "have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. The JSSA requires each United States district court to

"place into operation a written plan for random selection of . . . petit jurors that shall be designed to achieve" a fair cross section of the community. 28 U.S.C. § 1863(a). Congress specifically determined that the principal source of names for the random selection should be either "the voter registration lists or the lists of actual voters." 28 U.S.C. § 1863(b)(2).

The JSSA provides procedures for challenging the required written plan for jury selection. The JSSA allows a defendant to "move to dismiss the indictment or stay the proceedings" in order to challenge the district's jury selection plan required by the JSSA. 28 U.S.C. § 1867(a). In criminal cases, the defendant must file the motion "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered . . . the grounds [for the motion], whichever is earlier." Id. The JSSA allows the defendant to have discovery of records relating to jury selection process "during the preparation and pendency" of a motion to stay the proceedings or dismiss the indictment under the statute. 28 U.S.C. § 1867(f). To the extent Defendants were seeking relief under the JSSA, they failed to do so until two weeks after the trial, which made their claim clearly untimely. The government did not raise timeliness as an issue below, but the timeliness requirement "is to be strictly construed, and failure to comply

precisely with its terms forecloses a challenge under the Act."
United States v. Bearden, 659 F.2d 590, 595 (5th Cir. 1981).

Federal Rule of Criminal Procedure 12(b)(3)—formerly Rule
12(b)(2)—governs motions raising a Sixth Amendment fair cross-
section challenge, and, like JSSA motions, such motions must be
filed before trial.  See Davis v. United States, 411 U.S. 233,
241 (1973); United States v. Ballard, 779 F.2d 287, 295 (5th
Cir. 1986).  Failure to file the motion before trial amounts to
waiver of the fair cross-section claim, but a court may grant
relief from that waiver for good cause shown.  See Fed. R. Crim.
P. 12(e).  Defendants did not move for discovery with respect to
the jury selection process until 13 days after the verdict.  The
Eastern District of Virginia has used voter registration lists
as the source for jury pool selection for some time.  Defendants
have not articulated any reason why they failed to seek
discovery prior to trial, before the court spent time and
resources on jury selection and trial.  Likewise, defendants
have not articulated any reason to support their assertion that
African Americans are being systematically excluded during the
jury selection process.  See United States v. Ovalle, 136 F.3d
1092, 1108 (6th Cir. 1998) (rejecting jury selection claim where
defendants "did not raise such a claim until the trial was
completed and they began their direct appeal").

Accordingly, we affirm the denial of defendants' post-trial motion for discovery as to the fairness of the jury selection process.

VI.

Finally, Cole objects to the two-level sentencing enhancement imposed by the district court for obstruction of justice under U.S.S.G. § 3C1.1. Section 3C1.1 provides for a two-level increase in the base offense level if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction," if "the obstructive conduct related to . . . the defendant's offense of conviction." U.S.S.G. § 3C1.1.

The Presentence Report ("PSR") recommended application of the enhancement because Cole presented a fabricated alibi defense which the jury rejected. At trial, Cole called two witnesses to substantiate his alibi defense. First, Cole called Michelle Roberts, an employee at Fort Stanton apartments in Washington, D.C. Roberts testified that when prospective residents come to inquire about the apartments, they are asked to fill out a visitation card. Roberts indicated that her files contained a visitation card bearing Cole's name, and the government stipulated that the handwriting on the card in fact belonged to Cole. In addition to his name, Cole wrote the date

21

and the time of day—purportedly 2:10 p.m. on the day of the robbery which was approximately the time that the bank robbers were fleeing the BB&T. Roberts testified that when a prospect fills out the front side of the visitation card, an employee fills out the reverse side. Cole's card had not been completed by a Fort Stanton employee. Roberts, who was not there when the card was filled out, was therefore unable to verify its accuracy. Cell phone analysis placed Cole near Fort Stanton around 2:40 p.m.

Second, Cole called Charles Ashford, the owner of an automobile service shop. He testified that Cole appeared at 1:44 p.m. on the day of the robbery to pick up his girlfriend's car. On cross-examination, however, Ashford admitted that about two weeks before trial, he told police that he could not remember who picked up the car.

The PSR recommended assessing an enhancement under U.S.S.G. § 3C1.1 on the basis that "Cole . . . presented material[ly] false information in the form of false and fabricated alibis, which was a willful attempt to obstruct or impede the administration of justice with respect to the investigation and prosecution of the instant offense." J.A. 744. Cole objected to the PSR's recommendation that an enhancement be imposed. The district court concluded that "the guideline factors [are] properly assessed," J.A. 710, and sentenced Cole within the

guidelines range to a term of 144 months. The district court issued its judgment and a Statement of Reasons, filed under seal, expressly "adopt[ing] the presentence investigation report without change."

Cole contends that the district court failed to make the requisite findings of fact to support the U.S.S.G. § 3C1.1 enhancement. We disagree. The court adopted the PSR, which set forth sufficient factual findings to satisfy U.S.S.G. § 3C1.1. See U.S.S.G. § 3C1.1 cmt. 4(B) (explaining that "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding" is covered conduct under U.S.S.G. § 3C1.1); United States v. Walker, 29 F.3d 908, 911 (4th Cir. 1994) (recognizing that the district court may satisfy the duty to make factual findings by adopting the findings in the PSR). Accordingly, we reject this argument.

VII.

For the foregoing reasons, we affirm the convictions and sentences of the defendants.[2]

AFFIRMED

---

[2] Jones filed a motion for leave to submit a supplemental pro se reply brief and a motion to supplement that brief. We grant the motions but, having considered the issues raised therein, deny him relief on that basis as well.